# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### April 18, 2012 Session

## STATE OF TENNESSEE v. ROBERT NELSON BUFORD, III

**Direct Appeal from the Criminal Court for Davidson County**
**No. 2008-B-1355     J. Randall Wyatt, Judge**

**No. M2011-00323-CCA-R3-CD - Filed January 31, 2013**

A Davidson County Criminal Court Jury convicted the appellant, Robert Nelson Buford, III, of facilitation of first degree felony murder and facilitation of attempted especially aggravated robbery. After a sentencing hearing, the appellant received an effective thirty-five-year sentence. On appeal, he contends that (1) the evidence is insufficient to support the convictions; (2) the trial court should have suppressed his statement to police because he invoked his right to remain silent; (3) his prior bad acts were inadmissible; (4) the trial court should have given the jury a requested instruction; and (5) his effective sentence is excessive. Based upon the oral arguments, the record, and the parties' briefs, we conclude that the trial court erred by admitting the appellant's statement into evidence because the appellant invoked his right to remain silent but that the error was harmless. Therefore, we affirm the judgments of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court are Affirmed.**

NORMA MCGEE OGLE, J., delivered the opinion of the Court, in which ALAN E. GLENN and ROGER A. PAGE, JJ., joined.

Patrick G. Frogge, Nashville, Tennessee, for the appellant, Robert Nelson Buford, III.

Robert E. Cooper, Jr., Attorney General and Reporter; Clark B. Thornton, Assistant Attorney General; Victor S. Johnson, III, District Attorney General; and Kathy Morante, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

### I. Factual Background

In April 2008, the Davidson County Grand Jury indicted the then thirty-eight-year-old appellant; his brother, Kevin L. Buford; his nephews, Kevin D. Buford and Deangelo Monquez Buford, who were sixteen and seventeen years old, respectively; and Raymond Javoss Pirtle, also seventeen years old, for the first degree felony murder and attempted especially aggravated robbery of Billy Jack Shane Tuders. The appellant was tried separately from his co-defendants.[1]

At trial, Janice Tuders, the victim's mother, testified that the victim was thirty-three years old when he died. On January 21, 2008, the victim worked at the Texaco Xpress Lube on Clarksville Pike. He got off work about 5:15 p.m., received seventy dollars in cash from his employer for his day of work, and walked to the convenience store next door to buy a pack of cigarettes and a lottery ticket. The victim carried a wallet with him sometimes, but Ms. Tuders did not know if he had his wallet on January 21.

Officer Eric Richardson of the Metropolitan Nashville Police Department (MNPD) testified that on January 21, 2008, he was dispatched to an area near the Texaco Xpress Lube and arrived at 6:13 p.m. Other officers were present and tending to the victim. Officer Richardson found a spent shell casing, which had been ejected from a semi-automatic weapon, on the ground.

Detective Norris Tarkington of the MNPD testified that he arrived at the crime scene thirty to forty minutes after the initial call. Standing on Clarksville Pike and looking at the Texaco Xpress Lube, a car wash was to the right of the Xpress Lube, and the Bordeaux Phillips 66 convenience store was to the right of the car wash. Hunter's grocery store was across the street from the three businesses. Detective Tarkington found a spent nine millimeter shell casing in front of the car wash's office and a twenty-dollar bill and a lottery ticket close to the car wash's office door. A blood trail led from the car wash to the back of the Xpress Lube, where the victim was found, and a pool of blood and a knit cap were on the ground near the victim. From the evidence, Detective Tarkington determined that the victim was standing close to the office door of the car wash when he was shot. The victim ran through one of the car wash bays and behind the Xpress Lube, where he collapsed in the parking lot.

---

[1]At the time of the appellant's trial, Kevin L. Buford had been convicted of facilitation of first degree felony murder and attempted especially aggravated robbery, and Kevin D. Buford had been convicted of first degree felony murder and attempted especially aggravated robbery. See State v. Kevin L. Buford, Sr.,No. M2010-01618-CCA-R3-CD, 2012 Tenn. Crim. App. LEXIS 342, at *1 (Nashville, May 24, 2011); State v. Kevin D. Buford, No. M2010-02160-CCA-R3-CD, 2011 Tenn. Crim. App. LEXIS 958, at *1 (Nashville, Dec. 28, 2011).

On cross-examination, Detective Tarkington acknowledged that Clarksville Pike was a busy street and said that the victim was shot about the time "rush hour" ended. The grocery store across from the car wash had outside lights, but the lights were not bright. The Phillips 66 convenience store to the right of the car wash was known as a busy store and was well-lit.

Donna Jones testified that on January 21, 2008, she and her teenage son went to Hunter's grocery store on Clarksville Pike. As they were leaving, Jones heard gunshots across the street. She looked at the car wash and saw three African-American men running and laughing. The men ran from the car wash and got into the passenger side of a sport-utility-type vehicle (SUV). Jones said that she did not see their faces but that "two were probably younger men, but one was an older man." When Jones and her son got into their vehicle and pulled onto Clarskville Pike, the SUV was in front of them. Jones drove home and telephoned the police. She and her son gave statements to the police, and her son may have given the police a partial license plate number. The police showed her photograph arrays, but she could not identify anyone.

On cross-examination, Jones acknowledged that she had testified in previous trials and hearings related to the victim's death. She also acknowledged that she previously testified that she could not remember if she saw two or three men. However, she stated, "I think it was three."

Detective Harold Haney of the MNPD testified that shortly after the shooting, he learned about surveillance video showing the shooting. He obtained the video, and the State played it for the jury. The video camera, mounted at the Phillips 66 convenience store and turned toward the self-service car wash, shows some of the car wash bays. A person walks through one of the bays, toward the surveillance camera, and out of view on the bottom left of the screen. About one and one-half minutes later, two individuals walk through the adjacent, lighted car wash bay. They walk toward the surveillance camera, in the direction of the first person, and out of view on the bottom left side of the screen. Shortly thereafter, a fourth person walks through the same lighted bay and out of view but on the bottom right side of the screen. Less than one minute later, the victim appears on the bottom left of the screen, walking away from the Phillips 66 convenience store and toward the car wash bays. Someone approaches him from behind and hits him on the head. As the victim runs toward the car wash bays, the shooter points the gun at him. A flash of light appears as the shooter fires the gun at the victim. The victim runs through the lighted car wash bay and out of view at the top of the screen. The shooter and another person, who are the same two individuals seen walking together earlier in the video, run through the adjacent bay and out of view.

Jenness Schuhmann testified that in January 2008, she worked as a crime scene technician for the MNPD. On January 21, 2008, she went to the scene of the shooting and

collected a knit cap, a twenty-dollar bill, a Lotto ticket, and a nine millimeter shell casing. She also took photographs of the scene.

Lieutenant Frank Ragains of the MNPD testified that he lifted fingerprints off the suspects' SUV. Lorita Marsh of the MNPD testified as an expert in latent print examination that she examined the lifted prints and compared them to the five defendants' fingerprints. Marsh concluded that Kevin L. Buford's fingerprints were on the Explorer's driver-side and passenger-side front doors. Raymond Pirtle's fingerprints were on the driver-side and passenger-side rear doors. The appellant's fingerprints were on the passenger-side front and rear doors. On cross-examination, Marsh testified that she could not determine the ages of fingerprints.

Twenty-year-old Raymond Pirtle testified that he was friends with Kevin D. and Deangelo Buford, the sons of Kevin L. Buford, and had gone to school with them since the eighth grade. Pirtle said he carried a gun for protection. About two weeks before the crimes, Kevin D.[2] asked Pirtle for the gun, and Pirtle gave it to him. Pirtle said that about noon on January 21, 2008, Kevin D. came to Pirtle's home and asked if Pirtle "[wanted] to ride" with him and "do a robbery." Pirtle told him yes and got into a four-door Ford Explorer with him. Kevin L. was driving the SUV, and Deangelo was sitting in the front passenger seat. Kevin D. sat behind Kevin L., and Pirtle sat behind Deangelo. Kevin L. drove to the Burger King on Gallatin Road and told the three juveniles about a car dealership they could rob. Deangelo had Pirtle's gun, and the three juveniles walked to the car lot. However, they were scared and returned to the SUV. Kevin L. was disappointed that they had not committed the robbery and tried to get them to return to the car lot, but they refused. Kevin L. drove to an Auto Zone and went inside to see if surveillance cameras were in the store, but he returned to the Explorer and drove away from the store without telling the juveniles anything.

Pirtle testified that Kevin L. claimed he did not have enough money to buy gasoline and drive them home. Pirtle was friends with someone named "Little E," so Kevin L. drove to Little E's house. Little E walked outside to the Explorer, and Pirtle bought some marijuana from him. Kevin L., Kevin D., Deangelo, and Pirtle smoked the marijuana in the Explorer. Then Kevin L. drove downtown and picked up the appellant. Pirtle had never met or seen the appellant before that day, and the appellant sat in the backseat of the Explorer, between Kevin D. and Pirtle. Kevin L. drove to a liquor store on Jefferson Street and told everyone in the Explorer, "'I'm fixin to go in here and I am fixin to buy some liquor and I am going to tell y'all who is cashing their check and then when they come out that is when y'all rob them.'" Kevin L. went into the liquor store, bought some vodka, and returned to

_____

[2]Because three of the defendants share a surname, we will refer to them as "Kevin L.," "Kevin D.," and Deangelo for clarity.

-4-

the Explorer. He told them to rob an African-American man, but they did not want to rob the man because too many people were outside the store. Kevin L. came up with a plan for the appellant to rob Little E. He drove to the Buena Vista Market and told the juveniles to telephone Little E and have Little E meet them there. The appellant got Pirtle's gun from Deangelo, got out of the Explorer, and waited for Little E to arrive. When Little E arrived at the market and approached the Explorer, the appellant pretended not to know anyone in the Explorer, walked up to Little E, pointed the gun at him, and demanded money. Little E threw his money onto the ground. Pirtle did not know whether the appellant picked up the money. However, after the robbery, he saw the appellant run through a field. A short time later, Kevin L. picked up the appellant. The appellant still had Pirtle's gun.

Pirtle testified that Kevin L. told everyone in the Explorer, "'Y'all got 15 minutes to do a robbery, because I have got to pick up my wife from work.'" He pulled into one of the bays at the Xpress car wash on Clarksville Pike and saw the victim, who had walked through the car wash. Pirtle said that the victim was counting money and that Kevin L. told them, "'That is who y'all need to rob. He got some money right there.'" The appellant and Kevin D. got out of the Explorer, and Kevin L. drove to the grocery store across the street from the car wash. Pirtle got out of the Explorer and walked toward the car wash to help Kevin D. and the appellant. The victim came out of the Phillips 66 convenience store. Pirtle said that he saw Kevin D. hit the victim with the gun, that the victim turned around and hit Kevin D., and that Kevin D. shot the victim. Pirtle, Kevin D., and the appellant ran through the car wash bays and got back into the Explorer. Their seating arrangement was the same as before except that Pirtle was sitting in the middle of the backseat and the appellant was sitting directly behind Deangelo.

Pirtle testified that Kevin L. drove his two sons home and that they kept Pirtle's gun. Then Kevin L. drove Pirtle home. The next morning, the police arrived at Pirtle's house and arrested him. The police searched the house for the gun but did not find it. Pirtle acknowledged that he had testified in two previous trials related to this case, that he pled guilty to facilitation of second degree murder, and that he received a fifteen-year sentence to be served at thirty percent. He said that prior to the shooting on July 21, 2008, he had been arrested as a juvenile for evading arrest, bringing a weapon onto school property with intent to go armed, and disorderly conduct. He said that he was affiliated with the Gangster Disciples but that he had never committed a crime for the gang.

On cross-examination, Pirtle acknowledged that although Kevin L. claimed he did not have any money, Kevin L. bought vodka from the liquor store. Pirtle acknowledged that Kevin L. drove to the liquor store because he thought Mexicans cashed their checks there. Pirtle acknowledged testifying at Kevin L.'s trial that Kevin L. told them to rob a woman at the liquor store, not an African-American man. Pirtle spoke with the police on January 22,

2008, but did not tell them his complete story until January 2010, almost two years after the shooting. He acknowledged that he lied to the police when he spoke with them on January 22 but said he did not remember telling them that he pulled the gun out of his pants at the car wash and gave it to Kevin D. He also acknowledged that he talked to a court-appointed mental health evaluator and that he lied to the evaluator. He said he did not remember telling the evaluator that he blacked out and had no memory of the crimes. Pirtle acknowledged that Kevin D. used Pirtle's gun to shoot the victim. However, he said, "I had something to do with [the shooting], but I didn't get the chance to help because by the time I got over there everything was already happening." He acknowledged that Kevin D. and Deangelo also were members of the Gangster Disciples.

The defense played Pirtle's January 22, 2008, video-recorded interview for the jury. During the interview, Pirtle told the officers the following: The four Bufords picked him up about 2:00 p.m. on January 21, 2008, and they rode around for hours. They stopped at the grocery store across the street from the car wash on Clarksville Pike. Kevin D. and a "light-skinned dude" saw the victim, got out of the Explorer, and walked to the car wash. Pirtle also got out of the Explorer and walked across the street to the car wash. The victim walked through one of the car wash bays and went into the Phillips 66 convenience store. The appellant and Kevin D. waited in a "dark spot" outside. When the victim came out of the store, Kevin D. and the light-skinned man "got him." Kevin D. hit the victim on the head with the gun, wrestled with the victim, and shot him. Pirtle did not hear Kevin D. tell the victim, "Give me your wallet." Pirtle said that he was "right there with them" and that Kevin L. was waiting in the Explorer, which was still in the grocery store parking lot across the street. After the shooting, Pirtle, Kevin D., and the light-skinned man ran across the street to the Explorer. Pirtle did not know the light-skinned man's name and had never seen him before. Initially, Pirtle claimed that Kevin D. and Deangelo owned the gun. However, he later admitted that the gun was his and that he bought it "off the streets." He said that the gun was a "nine" and that he thought it was a Smith and Wesson. He explained that about three weeks before the shooting, he gave the gun to Kevin D. When Kevin D. and Deangelo picked him up on the afternoon of January 21, 2008, they returned the gun to him. However, before the shooting, Pirtle pulled the gun out of his pants and gave it back to them so they could "go hit the lick." He said that Kevin L. knew they were going to rob the victim but that Kevin L. did not know Kevin D. was going to shoot the victim. Pirtle told the officers that "we was all in it together" but that Kevin D. "took it too far." After the shooting, everyone was "talking bad" to Kevin D. for his having shot the victim. At the conclusion of the interview, the police officers told Pirtle that they had talked with Kevin D., that Kevin D. admitted shooting the victim, and that Kevin D. claimed he gave the gun to Pirtle after the shooting. Pirtle denied knowing the location of the gun. He said that Kevin D. and Deangelo had the gun when Kevin L. dropped them off at home.

-6-

On redirect examination, Pirtle acknowledged that much of what he told the officers during the January 22 interview was consistent with his testimony at the appellant's trial and with testimony he gave at previous trials. He said the light-skinned man was the appellant.

Sergeant Chris Steele of the MNPD testified that on January 21, 2008, he arrived at the crime scene about twenty minutes after the initial call. Shortly after his arrival, he learned about a video of the shooting and obtained it from a nearby business. He also spoke with Donna Jones, who described the suspect vehicle and gave him a license tag number. About thirty minutes later, officers located the vehicle, which was owned by Kevin L. and his wife, at a residence. Officers began watching the residence. When two vehicles left the home, officers followed them to the McDonald's on Gallatin Road. Kevin L., who was in one of the vehicles, agreed to go with the police to the police department. Sergeant Steele interviewed Kevin L. He also interviewed Kevin D., Deangelo, and Raymond Pirtle. Sergeant Steele interviewed Pirtle again on January 29, 2009, and showed Pirtle a photograph array. Pirtle selected the appellant's photograph and identified him as the light-skinned man present at the time of the shooting. The grand jury indicted the appellant, the police arrested him, and Sergeant Steele interviewed him on February 2, 2009.

The State played the appellant's video-recorded interview for the jury. During the interview, the appellant said he did not understand why he was being charged with murder when he did not shoot the victim. He claimed that his brother, nephews, and Raymond Pirtle picked him up from "the mission" on January 21 and that they rode around in the Explorer. The appellant wanted Kevin L. to drop him off at the Phillips 66 convenience store. Kevin D. told everyone in the Explorer that he needed some money and that he was going to rob someone, but the appellant and Kevin L. told him not to commit a robbery. Kevin L. parked across the street from the car wash on Clarkville Pike, and the appellant and Kevin D. walked through the car wash bays to the Phillips 66 convenience store. Pirtle was behind them. The victim came out of the convenience store as the appellant was about to go inside. The victim walked by the appellant, the appellant heard a gunshot, and Kevin D. and Pirtle ran across the street to the Explorer. The appellant also ran to the Explorer because he was scared and "didn't want to get left." After the incident, Kevin L. dropped off the appellant at "the mission." The appellant said that he did not encourage Kevin D. to rob the victim, that he did not know Kevin D. was going to rob the victim, and that he tried to stop Kevin D. when he saw what was happening.

On cross-examination, Sergeant Steele acknowledged that he showed "photographic line-ups" containing the appellant's photograph to Donna Jones and her son. Ms. Jones did not identify anyone, but her son identified Kevin D. and Raymond Pirtle. Sergeant Steele showed the Joneses arrays containing the appellant's photograph, but they did not identify him. Sergeant Steele said he used "trickery" during the appellant's interview in order to get

the appellant to talk with him. On redirect examination, Sergeant Steele acknowledged that both of the Joneses said they saw three people run away from the shooting.

Dr. Sandra Thomas, an assistant medical examiner for Davidson County, testified as an expert in forensic pathology that she did not perform the victim's autopsy but that she reviewed his autopsy report and concurred with its results. His cause of death was a gunshot wound to the torso, and his manner of death was homicide. The bullet entered the victim's back on the left side; struck his heart, spleen, and a couple of other muscular structures; and exited his left chest. The bullet traveled back to front, left to right, and slightly downward. The victim would have lived for a few minutes after receiving the wound. The victim had two twenty-dollar bills, a tube of Chapstick, a pack of cigarettes, two lighters, and a pocketknife on his person. On cross-examination, Dr. Thomas testified that the victim would have been able to run after the shooting.

The jury convicted the appellant of facilitation of first degree felony murder, a Class A felony, as a lesser-included offense of first degree felony murder and facilitation of attempted especially aggravated robbery, a Class C felony, as a lesser-included offense of especially aggravated robbery. After a sentencing hearing, the appellant received an effective thirty-five-year sentence.

## II. Analysis

### A. Sufficiency of the Evidence

The appellant contends that the evidence is insufficient to support the convictions because the evidence merely places him at the crime scene and because Raymond Pirtle's testimony was not sufficiently corroborated. The State argues that the evidence is sufficient. We agree with the State.

When an appellant challenges the sufficiency of the convicting evidence, the standard for review by an appellate court is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." Jackson v. Virginia, 443 U.S. 307, 319 (1979); see also Tenn. R. App. P. 13(e). The State is entitled to the strongest legitimate view of the evidence and all reasonable or legitimate inferences which may be drawn therefrom. State v. Cabbage, 571 S.W.2d 832, 835 (Tenn. 1978). Questions concerning the credibility of witnesses and the weight and value to be afforded the evidence, as well as all factual issues raised by the evidence, are resolved by the trier of fact. State v. Bland, 958 S.W.2d 651, 659 (Tenn. 1997). This court will not reweigh or reevaluate the evidence, nor will this court substitute its inferences drawn from the circumstantial evidence for those inferences drawn

by the jury. Id. Because a jury conviction removes the presumption of innocence with which a defendant is initially cloaked at trial and replaces it on appeal with one of guilt, a convicted defendant has the burden of demonstrating to this court that the evidence is insufficient. State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

A guilty verdict can be based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. State v. Hall, 976 S.W.2d 121, 140 (Tenn. 1998). "The jury decides the weight to be given to circumstantial evidence, and '[t]he inferences to be drawn from such evidence, and the extent to which the circumstances are consistent with guilt and inconsistent with innocence, are questions primarily for the jury.'" State v. Rice, 184 S.W.3d 646, 662 (Tenn. 2006) (quoting State v. Marable, 313 S.W.2d 451, 457 (Tenn. 1958)). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" State v. Dorantes, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting State v. Hanson, 279 S.W.3d 265, 275 (Tenn. 2009)).

The appellant was convicted of facilitation of first degree felony murder and facilitation of attempted especially aggravated robbery. As charged in this case, first degree felony murder is the "killing of another committed in the perpetration of or attempt to perpetrate any . . . robbery." Tenn. Code Ann. § 39-13-202(a)(2). "Especially aggravated robbery is robbery . . . (1) [a]ccomplished with a deadly weapon; and (2) [w]here the victim suffers serious bodily injury." Tenn. Code Ann. § 39-13-403(a). "Robbery is the intentional or knowing theft of property from the person of another by violence or putting the person in fear." Tenn. Code Ann. § 39-13-403(a). "A person is criminally responsible for the facilitation of a felony, if, knowing that another intends to commit a specific felony, but without the intent required for criminal responsibility under § 39-11-402(2), the person knowingly furnishes substantial assistance in the commission of the felony." Tenn. Code Ann. § 39-11-403(a). Tennessee Code Annotated section 39-11-402(2) provides, "A person is criminally responsible for an offense committed by the conduct of another, if . . . [a]cting with intent to promote or assist the commission of the offense, or to benefit in the proceeds or results of the offense, the person solicits, directs, aids, or attempts to aid another person to commit the offense."

Taken in the light most favorable to the State, the evidence shows that the appellant used the murder weapon to rob Little E. After the robbery, Kevin L. stopped at the Xpress car wash on Clarkville Pike, saw the victim walking and counting money, and told everyone in the Explorer, "'That is who y'all need to rob." The appellant and Kevin D. got out of the Explorer and followed the appellant to the Phillips 66 convenience store. Kevin L. drove to the grocery store across the street from the car wash, and Pirtle got out of the Explorer and walked toward the car wash to help Kevin D. and the appellant. When the victim came out of the store, Kevin D. hit him on the head and shot him. Then Kevin D., the appellant, and

Pirtle ran back to the Explorer. While no direct evidence establishes the appellant's guilt in this case, the jury could infer from the evidence that he knew Kevin D. was going to rob the victim and that he provided substantial assistance by accompanying Kevin D. to the Phillips 66 convenience store and waiting with Kevin D. for the victim to exit the store. Thus, the evidence is sufficient to support the convictions.

Turning to the appellant's claim that Pirtle's testimony was not sufficiently corroborated, the appellant is correct in that "a conviction may not be based solely upon the uncorroborated testimony of an accomplice." State v. Stout, 46 S.W.3d 689, 696 (Tenn. 2001), superseded by statute on other grounds as stated in State v. Odom, 137 S.W.3d 572, 580-81 (Tenn. 2004). As our supreme court has explained,

> There must be some fact testified to, entirely independent of the accomplice's testimony, which, taken by itself, leads to the inference, not only that a crime has been committed, but also that the defendant is implicated in it; and this independent corroborative testimony must also include some fact establishing the defendant's identity. This corroborative evidence may be direct or entirely circumstantial, and it need not be adequate, in and of itself, to support a conviction; it is sufficient to meet the requirements of the rule if it fairly and legitimately tends to connect the defendant with the commission of the crime charged. It is not necessary that the corroboration extend to every part of the accomplice's evidence. The corroboration need not be conclusive, but it is sufficient if this evidence, of itself, tends to connect the defendant with the commission of the offense, although the evidence is slight and entitled, when standing alone, to but little consideration.

State v. Bigbee, 885 S.W.2d 797, 803 (Tenn. 1994) (quoting State v. Gaylor, 862 S.W.2d 546, 552 (Tenn. Crim. App. 1992)) (brackets omitted), superseded by statute on other grounds as stated in Odom, 137 S.W.3d at 580-81. But, "[w]hether sufficient corroboration exists is a determination for the jury." State v. Shaw, 37 S.W.3d 900, 903 (Tenn. 2001).

In the present case, Donna Jones testified that she heard a gunshot, looked across the street, and saw three men run to the Explorer. She also testified that two of the men were young but that one was "older," that they were laughing, and that she saw them get into the passenger side of the Explorer. The appellant's fingerprints were found on the Explorer's passenger-side front and rear doors. In our view, Ms. Jones' testimony and the fingerprint evidence connected the appellant to the crimes and established his identity. Therefore,

Pirtle's testimony was sufficiently corroborated.

## B. Right to Remain Silent

The appellant contends that the trial court erred by denying his motion to suppress his statement to police on February 2, 2009, because Sergeant Steele questioned him after he invoked his right to remain silent. The State contends that the trial court properly denied the motion. We conclude that the trial court erred by denying the appellant's motion to suppress but that the error was harmless.

Before trial, the appellant filed a motion to suppress his statement, arguing that Sergeant Steele continued to question him after he refused to waive his Miranda rights. At a pretrial hearing on the motion, defense counsel argued that when Sergeant Steele asked the appellant if he wanted to waive his right to remain silent, the appellant answered, "Nah." Counsel also argued that the appellant's answer, coupled with his body language, made it clear that he was saying no. However, Sergeant Steele continued to question the appellant "as if that never happened." The State argued that "the tape will speak for itself."

The defense played the relevant portion of the appellant's video-recorded interview for the trial court. The video shows the appellant sitting at a table across from Sergeant Steele and another officer. The appellant is facing toward the video camera, which is mounted above him and the police officers, and the officers have their backs to the camera. Sergeant Steele, reading from a waiver of rights form, asks the appellant, "You have the right to remain silent. Do you understand that right?" The appellant nods his head, and the second officer in the interview room says, "Yes, sir." Sergeant Steele makes a mark on the form, continues reading from the form by asking the appellant if he wants to waive that right and answer questions, and looks up at the appellant. The appellant answers something to the effect of "na-ah." Sergeant Steele looks down, makes another mark on the form, and informs the appellant as follows:

> So before we ask, so before we continue the additional rights you must understand anything you say can be used against you in court. You got a right to a lawyer for advice before we ask you questions and have that lawyer with you during questioning. If you can't afford a lawyer one will be provided to you free of charge before we ask any questions. So, I've read the statement of my rights or had the rights read to me and understand what my rights are. And when I make a statement or answer questions I do not want a lawyer at this time. I understand and know what I am doing. No promises or threats have been made

-11-

to me. No pressure or coercion of any kind has been used against me. I also understand that anytime I choose to stop answering questions the interview will cease. Understand that?

The appellant nods his head up and down and signs the waiver of rights form.

Sergeant Steele testified for the State at the hearing and acknowledged that he had informed suspects of their rights many times. During the appellant's interview, Sergeant Steele marked on the waiver of rights form that the appellant wanted to waive his right to remain silent and answer questions. The State asked him, "Now, you just saw the video are you willing to sit here and say that you believe that he said, 'Nah', Detective?" Sergeant Steele said that he would not have continued questioning the appellant "if we had any indication that he would have said, no, he didn't want to speak to us." The trial court then asked the officer, "[W]hat did it sound like to you that he said, what did you think that he said[?]" Sergeant Steele answered, "It has been almost three years and in watching that, I mean, it is hard to hear and I am sure because even in my - in my supplement I put that he agreed to speak with us during the interview."

On cross-examination, Sergeant Steele testified that he always filled out the waiver of rights form for a suspect. He acknowledged that he filled out the appellant's form and that he "pushed" it across the table for the appellant to sign. He also acknowledged that the appellant did not read the form before the appellant signed it.

The trial court noted that the video-recording was "not as clear as it could be" and that it wanted to view the recording again. On the morning of trial, the court ruled as follows:

> The other day we had a hearing in here having to do with [Sergeant] Steele's interview of the defendant and even though I think it would be a little more clear considering that interview and everything about it, the Court is of the opinion that when the defendant was first asked about his rights and so forth there was some little response that wasn't really an unequivocal sort of statement as much as it was a na, uh, na-na, uh-huh, unh-uh, whatever word like that.
>
> [T]he detectives were [reading] from a pretty straightforward waiver form that spelled out all of his rights. The right to remain silent, the right to save his views in court and this and this and that and the defendant was kind of nodding his head in agreement as if he understood his right to remain silent and then

-12-

[Sergeant] Steele asked him with that right in mind do you wish to waive that right and answer questions which the defendant made some kind of a sound like I just said a nuh, na, na-na-na, and . . . I can see how you could say that sounded like a no.

[Sergeant] Steele testified that it was not a no [and] that he would have ceased questioning at that time if he thought it was and under the totality of the circumstances the Court is of the opinion that that was not a clear refusal or denial of the defendant understanding his rights, nor was it a clear denial or whatever rejection of him talking to the detective about it and I think under the circumstances all of them the Court finds that he did waive his rights.

There was a statement read to the defendant right before he signed it. I read the statement of my rights, the rights have been read to me and this and this and this and indicated that no promises or threats have been made and I understand that I can stop talking at anytime and he was asked, the defendant was, if he understood that paragraph and he nodded yes in agreement. He nodded yes in agreement I might say and then he signed the waiver of rights form.

In reviewing a trial court's determinations regarding a suppression hearing, "[q]uestions of credibility of the witnesses, the weight and value of the evidence, and resolution of conflicts in the evidence are matters entrusted to the trial judge as the trier of fact." State v. Odom, 928 S.W.2d 18, 23 (Tenn. 1996). Thus, "a trial court's findings of fact in a suppression hearing will be upheld unless the evidence preponderates otherwise." Id. Nevertheless, appellate courts will review the trial court's application of law to the facts purely de novo. See State v. Walton, 41 S.W.3d 75, 81 (Tenn. 2001).

Both the Fifth Amendment to the United States Constitution and article I, section 9 of the Tennessee Constitution provide protection against compulsory self-incrimination. To this end, "'once warnings have been given, . . . if the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At that point, he has shown that he intends to exercise his Fifth Amendment privilege.'" State v. Crump, 834 S.W.2d 265, 269 (Tenn. 1992) (quoting Miranda v. Arizona, 384 U.S. 436, 473-74 (1966)).

We have carefully reviewed the video recording of the interview. Clearly, the

-13-

appellant did not say the word "no." However, he also did not say "yes." Instead, he said, "Na ah." He also appeared to shake his head, albeit slightly, to the side. Sergeant Steele was looking directly at the appellant. Without hesitation, Sergeant Steele marked on the form that the appellant wanted to waive his right to remain silent and began reading the next paragraph on the form to the appellant. The appellant never indicated that Sergeant Steele had misunderstood him and signed the waiver of rights form. Sergeant Steele testified at the hearing that the appellant did not give any indication that he wanted to remain silent, and the trial court obviously found the officer credible on that point. However, this court has stated that whether a suspect has invoked his right to counsel is an objective, not subjective, standard. State v. Koffman, 207 S.W.3d 309, 318 (Tenn. Crim. App. 2006). We see no reason why the standard for the right to remain silent would be any different. Based upon our review of the video recording, we conclude that the appellant invoked his right to remain silent. Therefore, the trial court should have granted his motion to suppress his statement.

Next, we must determine whether the trial court's error was harmless. In conducting harmless error analysis, our supreme court has identified three categories of errors: (1) structural constitutional error; (2) non-structural constitutional error; and (3) non-constitutional error. State v. Rodriguez, 254 S.W.3d 361, 371 (Tenn. 2008); State v. Powers, 101 S.W.3d 383, 397 (Tenn. 2003); State v. Garrison, 40 S.W.3d 426, 433-34 (Tenn. 2000); State v. Harris, 989 S.W.2d 307, 314-15 (Tenn. 1999).

Structural constitutional errors involve "defects in the trial mechanism" that "compromise the integrity of the judicial process itself." Rodriguez, 254 S.W.3d at 371. Structural constitutional errors "have an impact upon '[t]he entire conduct of trial from beginning to end'" and require automatic reversal. Momon v. State, 18 S.W.3d 152, 165 (Tenn. 1999) (quoting Arizona v. Fulminante, 499 U.S. 279, 311 (1991)). The denial of the right to counsel, denial of the right to self-representation at trial, denial of the right to a jury trial, and racial discrimination in grand jury selection are examples of structural constitutional errors. Rodriguez, 254 S.W.3d at 371; Momon, 18 S.W.3d at 165-66.

Constitutional errors that are not structural do not require automatic reversal. "However, the burden on the State to demonstrate that a non-structural constitutional error is harmless remains quite stringent. The existence of a non-structural constitutional error requires reversal unless the State demonstrates beyond a reasonable doubt that the error is harmless." Rodriguez, 254 S.W.3d at 371. The test to be applied is "'whether it appears "beyond a reasonable doubt that the error complained of did not contribute to the verdict obtained."'" Id. (quoting State v. Allen, 69 S.W.3d 181, 190 (Tenn. 2002) (quoting Neder v. United States, 527 U.S. 1, 15 (1999))). For non-constitutional errors, a defendant challenging a conviction has the burden of demonstrating that the error "more probably than not affected the judgment or would result in prejudice to the judicial process." Tenn. R. App.

P. 36(b); <u>Rodriguez</u>, 254 S.W.3d at 371-72. Appellate courts consider the entire record in evaluating whether the error affected the outcome of the trial. <u>Rodriguez</u>, 254 S.W.3d at 371-72.

The trial court's admitting the appellant's statement, taken in violation of his right to remain silent, did not impact the trial from beginning to end and is a non-structural constitutional error. Therefore, the State has the burden of proving beyond a reasonable doubt that the error did not contribute to the appellant's conviction. In our view, the State has met its burden. Pirtle testified that the appellant robbed Little E at the Buena Vista Market. Kevin L. wanted everyone to commit another robbery, drove to the Xpress car wash, and saw the victim counting money. Kevin L. told everyone in the Explorer that the victim was the person they needed to rob. Pirtle said that the appellant and Kevin D. got out of the Explorer, walked through the car wash bay, and walked to the Phillips 66 convenience store. When the victim came out of the store, Kevin D. shot him and everyone ran back to the Explorer. As stated previously, Ms. Jones' testimony and the fingerprint evidence sufficiently corroborated Pirtle's testimony. The jury obviously considered the evidence carefully, concluding that the appellant did not have the intent required to convict him as charged but that he provided "substantial assistance" to Kevin D. Given the evidence, we conclude that the trial court's error was harmless.

## C. Prior Bad Acts

Next, the appellant contends that the trial court erred by allowing Raymond Pirtle to testify about the appellant's prior bad acts pursuant to Rule 404(b), Tennessee Rules of Evidence. In addition, he contends that the trial court did not follow the procedural mandates of the Rule by failing to address whether Pirtle's testimony was relevant or clear and convincing and by failing to address whether the probative value of the testimony was outweighed by the danger of unfair prejudice. The State argues that Pirtle's testimony was admissible. We agree with the State.

Before trial, the State filed a motion to introduce evidence of bad acts the appellant committed on January 21, 2008, prior to his committing the crimes in this case. Before opening statements, the trial court held a jury-out hearing to determine the admissibility of the evidence.

During the hearing, Pirtle's testimony was essentially the same as his trial testimony. Specifically, he testified that on the afternoon of January 21, 2008, he rode around with Kevin D., Deangelo, and Kevin L. and that they planned to "hit a lick," meaning commit a robbery. Initially, they planned to rob a car lot across the street from Burger King. However, Kevin D., Deangelo, and Pirtle did not want to rob the lot, so Kevin L. drove to the Auto

Zone in order to check the business for surveillance cameras.  After leaving Auto Zone, the group bought marijuana from Little E, smoked it, and picked up the appellant at his place of employment downtown.  Kevin L. drove to a liquor store, where Mexicans were known to cash their checks, and went inside.  When he came out, he told Kevin D., Deangelo, Pirtle, and the appellant about a person they could rob.  Pirtle, Kevin D., and Deangelo were supposed to commit the robbery, but they refused.  Deangelo telephoned Little E and offered to buy more marijuana, and Kevin L. drove to the Buena Vista Market in Pirtle's neighborhood so they could meet Little E.  When the Explorer arrived at the market, the appellant got out of the SUV and pretended to use a pay telephone.  When Little E arrived and walked to the Explorer, the appellant showed a gun and robbed him.  Kevin L. drove away from the market but picked up the appellant later on another street.  Kevin L. announced that they had fifteen minutes to commit a robbery because he had to pick up his wife from work.  He stopped at the car wash on Clarksville Pike, and the appellant and Kevin D. got out of the Explorer.  Kevin L. drove across the street, and Pirtle got out and walked to the car wash.

On cross-examination, Pirtle testified that he thought they picked up the appellant from the appellant's place of employment because the appellant was wearing a "button-up" shirt and a coat.  He had not seen the appellant prior to January 21, 2008, and did not talk to the appellant.  Pirtle said Kevin L. made the appellant rob Little E at the Buena Vista Market.  Pirtle acknowledged that he, Kevin D., and Deangelo were members of the Gangster Disciples and that he had previous charges for possessing a weapon at school and evading arrest.  He also acknowledged that he had been in numerous fights at school and said that he had been suspended from school possibly thirty times.

At the conclusion of Pirtle's testimony, defense counsel noted that the trial court had already ruled in previous 404(b) hearings for the appellant's co-defendants that Pirtle's testimony was admissible.  Nevertheless, defense counsel argued that Pirtle's story was "ridiculous" and that "[t]his robbery of the weed dealer in [particular] is one of the more outlandish things that I have ever heard."  The State argued, "He testified at a previous 404(b) hearing.  He has testified at some of their trials . . . all about the same items and he has been consistent all the way through.  He has never been inconsistent about what happened and we would just ask to be permitted to use the testimony."  The trial court ruled as follows:

> Here is the way that I hear him today having to do with this man
> over here Mr. Robert Nelson Buford.  His testimony has been
> mostly consistent with regard to the people coming, the man
> coming Little E or Little Edward or whatever his name was to
> that phone booth and all of that business about the marijuana.

-16-

Mr. Robert Buford was there then and he is testifying that he had the pistol and that he robbed him and it was attempting to be, looking like it was, like he was independent of the other people in the car and then they later saw him through and he came over and met him even though they were all involved together.

I am going to allow him to testify with regard to that incident and let the jury give it whatever weight they think it deserves and I will instruct the jury like I did the other time about this his leading up to the incident that we are here about now.

At first, the trial court ruled that Pirtle could testify only about the robbery of Little E because any bad acts that occurred before the group picked up the appellant were irrelevant. However, the State argued that the earlier bad acts were relevant because "the whole point is that the robberies actually are unsuccessful until [the appellant] gets on the scene and again those items that before he gets in are not 404(b)." The State argued, "It is part of the State's proof . . . the whole thing was that they were going out to rob people and the testimony was and it will be from Mr. Pritle that that was made plain to [the appellant]." The trial court replied, "He didn't make it plain in here then." Nevertheless, the trial court was persuaded by the State's argument and ruled that Pirtle could testify about events that occurred before the appellant became involved. Later during the trial, defense counsel informed the trial court that he forgot to argue on the record during the 404(b) hearing that Pirtle's prior bad act testimony was "highly prejudicial and not probative." The trial court stated, "I will note for the record that you have argued that." The trial court also stated, "I would have made the same decision after that."

Tennessee Rule of Evidence 404(b) provides,

Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity with the character trait. It may, however, be admissible for other purposes. The conditions which must be satisfied before allowing such evidence are:

(1) The court upon request must hold a hearing outside the jury's presence;

(2) The court must determine that a material issue exists

-17-

other than conduct conforming with a character trait and must upon request state on the record the material issue, the ruling, and the reasons for admitting the evidence;

(3) The court must find proof of the other crime, wrong, or act to be clear and convincing; and

(4) The court must exclude the evidence if its probative value is outweighed by the danger of unfair prejudice.

See also State v. Thacker, 164 S.W.3d 208, 240 (Tenn. 2005); State v. Parton, 694 S.W.2d 299, 302 (Tenn. 1985). A trial court's decision regarding the admission of Rule 404(b) evidence will be reviewed under an abuse of discretion standard; however, "the decision of the trial court should be afforded no deference unless there has been substantial compliance with the procedural requirements of the Rule." State v. DuBose, 953 S.W.2d 649, 652 (Tenn. 1997).

Generally, "[o]nly in an exceptional case will another crime, wrong, or bad act be relevant to an issue other than the accused's character. Such exceptional cases include identity, intent, motive, opportunity, or rebuttal of mistake or accident." State v. Luellen, 867 S.W.2d 736, 740 (Tenn. Crim. App. 1992). In making its decision regarding the admissibility of the testimony, the trial court must first determine if the offered testimony is relevant to prove something other than the appellant's character. "The jury may consider evidence admitted under 404(b) as substantive evidence at trial." State v. Kiser, 284 S.W.3d 227, 288 (Tenn. 2009).

Turning to the instant case, the State's theory was that the appellant was criminally responsible for the victim's death because he knew Kevin D. was going to rob the victim and participated in the attempted robbery. Meanwhile, the appellant's defense was that he was merely present and did not know Kevin D. was going to rob the victim. However, the fact that the appellant used the murder weapon to rob Little E shortly before the attempted robbery of the victim was highly relevant to the appellant's intent in this case.

The appellant also claims that the trial court failed to find that proof of the Little E robbery was clear and convincing. In support of his argument, the appellant notes that the trial court said, "He didn't make it plain in here then." We disagree with the appellant. The trial court noted that Pirtle had testified previously and that Pirtle's prior testimony was consistent with his testimony in the jury-out hearing. Therefore, we can infer that the court found Pritle's testimony about the robbery of Little E to be clear and convincing. In our view, the trial court's stating that Pirtle "didn't make it plain in here" was not a reference to

-18-

the veracity of Pirtle's testimony about the robbery of Little E but was the trial court's way of saying that Pirtle's testimony may not establish that the appellant knew Kevin D. was going to rob the victim.

The appellant also contends that the trial court failed to address the probative value of Pirtle's testimony about the robbery of Little E. Again, we disagree. Defense counsel specifically raised the issue later in the trial, and the trial court stated that its ruling would have been the same. Thus, the trial court found that the probative value of the testimony was not outweighed by the danger of unfair prejudice. We agree with the trial court. Although Pirtle's testimony about the robbery of Little E was highly prejudicial, given that Pirtle's testimony was highly relevant to the appellant's intent in this case, we cannot say that the probative value of the evidence was outweighed by the danger of unfair prejudice.

To the extent that the appellant is arguing that Pirtle's testimony about prior bad acts committed by Kevin L., Kevin D., Deangelo, and Pirtle before the appellant became involved were inadmissible, we agree that the testimony did not violate Rule 404(b), Tennessee Rule of Evidence, because the prior bad acts were not the appellant's prior bad acts. Moreover, like the trial court, we find it relevant that the juveniles repeatedly considered committing a robbery but did not actually do so until the appellant arrived. Such evidence supported the theory that the appellant knew and encouraged the robbery of the victim. The testimony was prejudicial. However, we cannot say that the probative value of the testimony was substantially outweighed by the danger of unfair prejudice. See Tenn. R. Evid. 403. Therefore, we conclude that the trial court did not err by ruling that Pirtle's testimony was admissible.

### D. Jury Instructions

The appellant contends that the trial court erred by refusing to give a requested jury instruction relating to accessory after the fact. He contends that the requested instruction was necessary because his defense was that, "if he shared any culpability, it was that of accessory after the fact, rather than as a principal." The State contends that the trial court properly refused to give the instruction. We agree with the State.

The appellant requested that the trial court give the following special instruction during the jury charge: "Being an accessory after the fact to a crime committed does not make one criminally responsible for that crime. Accessory after the fact is a separate crime and it has not been charged in this indictment." The trial court refused to give the instruction, concluding that accessory after the fact did not relate to this case.

A defendant has a "constitutional right to a correct and complete charge of the law."

-19-

State v. Teel, 793 S.W.2d 236, 249 (Tenn. 1990).  Accordingly, trial courts "should give a requested instruction if it is supported by the evidence, embodies a party's theory, and is a correct statement of the law."  State v. Phipps, 883 S.W.2d 138, 150 n.20 (Tenn. Crim. App. 1994).  A charge resulting in prejudicial error is one that fails to fairly submit the legal issues to the jury or misleads the jury about the applicable law.  State v. Hodges, 944 S.W.2d 346, 352 (Tenn. 1997).  Tenn. Code Ann. § 39-11-411(a) provides that

> A person is an accessory after the fact who, after the commission of a felony, with knowledge or reasonable ground to believe that the offender has committed the felony, and with the intent to hinder the arrest, trial, conviction or punishment of the offender:
>
> (1) Harbors or conceals the offender;
>
> (2) Provides or aids in providing the offender with any means of avoiding arrest, trial, conviction or punishment; or
>
> (3) Warns the offender of impending apprehension or discovery.

Turning to the instant case, the appellant was not charged with being an accessory after the fact, and the proof would not have supported a conviction for that offense. Although the appellant claims that the trial court should have given the requested instruction because his theory of the case was that if he shared any culpability, it was that of accessory after the fact, he did not claim at any time before or during the trial that he harbored, concealed, provided aid, or warned the offenders after the offenses in this case, and defense counsel did not make that argument during closing arguments.  Therefore, the trial court properly refused to give the requested instruction.

## E.  Sentencing

Finally, the appellant contends that his effective sentence is excessive because the trial court sentenced him to the maximum punishments in the range and ordered consecutive sentencing.  The State argues that the trial court properly sentenced the appellant. We agree with the State.

At the sentencing hearing, Janice Tuders, the victim's mother, testified that "if it had not been for [the appellant] my son may not be dead right now."  She said that the defendants "could have flipped hamburgers for a job" and that they "didn't have to get out and do what

they are doing." She said that she had raised eight children and that "they have never done anything like this." She said that the appellant was wrong but that she would leave his sentences up to the trial court.

The appellant made a statement on his own behalf, saying that he wanted to apologize to Ms. Tuders and the victim's family for their loss of the victim. He said that he was sorry for "the senseless act of my codefendant" and that "I also stand for those from my family who did not stand and have no apology at all."

The State introduced the appellant's presentence report into evidence. According to the report, then forty-one-year-old appellant had two-year-old triplets with his girlfriend of seven years and a ten-year-old daughter from a previous relationship. The report shows that the appellant obtained his GED and a certificate for commercial cleaning while in prison. In the report, the appellant described his physical and mental health as "good" but said he suffered intermittent knee pain from having been accidentally shot in the knee by a friend in 1991. The appellant reported that he began using alcohol when he was sixteen years old, that he did not consume alcohol to the point of intoxication, and that he was not intoxicated when the crimes in this case were committed. On his attorney's advice, the appellant would not answer questions pertaining to his drug use for the report. The report shows that the appellant worked for Manpower from January 2004 to May 2005 and for Crutcher Foundation from January 2007 to February 2008. The report also shows that the appellant has been committing crimes since he was eighteen years old and has been convicted of possession of cocaine with intent to sell, possession of a controlled substance for resale, breach of the peace, conspiracy to conceal stolen property, concealing stolen property, driving without a license, resisting arrest, reckless endangerment, criminal impersonation, misdemeanor possession of anhydrous ammonia, misdemeanor theft, and vandalism. He has nine prior convictions for criminal trespass, three convictions for possession of drug paraphernalia, two convictions for carrying a weapon, and two convictions for public intoxication. The appellant also has had a sentence involving probation revoked.

The trial court applied enhancement factor (1), that "[t]he defendant has a previous history of criminal convictions or criminal behavior, in addition to those necessary to establish the appropriate range," and factor (2), that the "defendant was a leader in the commission of an offense involving two (2) or more criminal actors." Tenn. Code Ann. § 40-35-114(1), (2). However, the trial court stated that factor (1) was the "main" enhancement factor. The trial court found no mitigating factors applicable. For the facilitation of first degree murder conviction, a Class A felony, the trial court sentenced him as a Range I, standard offender to twenty-five years. See Tenn. Code Ann. § 40-35-112(a)(1). For the facilitation of especially aggravated robbery conviction, a Class C felony, the trial court sentenced him as a Range II, multiple offender to ten years. See Tenn.

Code Ann. § 40-35-112(b)(3). The trial court ordered that the appellant serve the sentences consecutively based upon his extensive record of criminal activity. See Tenn. Code Ann. § 40-35-115(b)(2).

Previously, appellate review of the length, range, or manner of service of a sentence was de novo with a presumption of correctness. See Tenn. Code Ann. § 40-35-401(d). However, our supreme court recently announced that "sentences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" State v. Bise, 380 S.W.3d 682, 708 (Tenn. 2012). In conducting its review, the trial court considers the following factors: (1) the evidence, if any, received at the trial and the sentencing hearing; (2) the presentence report; (3) the principles of sentencing and arguments as to sentencing alternatives; (4) the nature and characteristics of the criminal conduct involved; (5) evidence and information offered by the parties on enhancement and mitigating factors; (6) any statistical information provided by the administrative office of the courts as to sentencing practices for similar offenses in Tennessee; (7) any statement by the appellant in his own behalf; and (8) the potential for rehabilitation or treatment. See Tenn. Code Ann. §§ 40-35-102, -103, -210; see also State v. Ashby, 823 S.W.2d 166, 168 (Tenn. 1991). The burden is on the appellant to demonstrate the impropriety of his sentence. See Tenn. Code Ann. § 40-35-401, Sentencing Comm'n Cmts.

In determining a specific sentence within a range of punishment, the trial court should consider, but is not bound by, the following advisory guidelines:

> (1) The minimum sentence within the range of punishment is the sentence that should be imposed, because the general assembly set the minimum length of sentence for each felony class to reflect the relative seriousness of each criminal offense in the felony classifications; and

> (2) The sentence length within the range should be adjusted, as appropriate, by the presence or absence of mitigating and enhancement factors set out in §§ 40-35-113 and 40-35-114.

Tenn. Code Ann. § 40-35-210(c).

The statutory enhancement factors are advisory only. See Tenn. Code Ann. § 40-35-114; State v. Carter, 254 S.W.3d 335, 343-44 (Tenn. 2008). We note that "a trial court's weighing of various mitigating and enhancement factors [is] left to the trial court's

sound discretion." Carter, 254 S.W.3d at 345. In other words, "the trial court is free to select any sentence within the applicable range so long as the length of the sentence is 'consistent with the purposes and principles of [the Sentencing Act].'" Id. at 343.

> [A]ppellate courts are therefore left with a narrower set of circumstances in which they might find that a trial court has abused its discretion in setting the length of a defendant's sentence . . . [and are] bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out in sections -102 and -103 of the Sentencing Act.

Id. at 345-46.

The appellant contends that the trial court erred by applying enhancement factor (1) regarding his previous history of criminal convictions or behavior because the court also used his prior convictions to order consecutive sentencing. However, we agree with the trial court that the appellant's criminal history is sufficient to enhance the length of his sentences and that it is "extensive" as required for the imposition of consecutive sentencing. The appellant also claims that this court is "forced to guess" what weight the trial court placed on enhancement factor (1). However, the trial court stated that factor (1) was the "main" factor and enhanced the appellant's sentences to the maximum in the ranges, demonstrating that the court gave great weight to that factor. Finally, the appellant contends that the trial court failed to state whether it thought the appellant, his brother, or both were the leaders in the commission of the offenses. However, the trial court found both of them to be leaders, stating, "I would think his brother moreso, but [the appellant] just right near him, were the leaders of this if anyone was." See State v. Hicks, 868 S.W.2d 729, 731 (Tenn. Crim. App. 1993) (observing that more than one criminal can be a leader in the commission of the offense). We conclude that the trial court properly sentenced the appellant.

### III. Conclusion

Based upon the oral arguments, the record, and the parties' briefs, we affirm the judgments of the trial court.

_____
NORMA McGEE OGLE, JUDGE